**INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**THDEE PRODUCTS, INC., Respondent.**

**Nos. 22797, 22911.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 27, 1969.

Decided April 3, 1970.

Petition for Rehearing Denied July 10, 1970.

---

Mr. Melvin Warshaw, with whom Mr. Irving Abramson and Miss Ruth Weyand, Washington, D. C., were on the brief, for petitioner in No. 22,797.

Mr. Eugene B. Granof, Atty., National Labor Relations Board, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, were on the brief, for petitioner in No. 22,911 and respondent in No. 22,797. Mr. Harold B. Zanoff, Attorney, National Labor Relations Board, also entered an appearance for petitioner in No. 22,911 and respondent in No. 22,797.

Mr. Roy E. Browne, Akron, Ohio, for respondent in No. 22,911.

Before LEVENTHAL, ROBINSON and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case arises on the Union's petition to review, and on a Board application to enforce an order of the National Labor Relations Board. In its decision and order, reported at 174 NLRB No. 103, the Board found that Tiidee Products, Inc. (the Company) violated subsections (1), (3) and (5) of § 8(a) of

the National Labor Relations Act.[1] The Board entered an order forbidding interference with employees' section 7 rights, and requiring that employees unlawfully laid off or discharged be reinstated and made whole for loss of earnings. As to the 8(a) (5) violation, the Board ordered the Company to bargain collectively with the Union and to furnish information pertaining to wage and fringe benefits. The order also required the posting of an appropriate notice.

The Company concedes the 8(a) (5) violation and some of the 8(a) (1) violations charged, but resists the findings and remedies dealing with the other alleged violations. The Union agrees with the Board's findings but complains that the remedies prescribed are inadequate. We grant the Board's application to enforce the order already entered. On the Union's petition seeking further relief we remand for further proceedings.

A. *The Violations of §§ 8(a) (1) and 8(a) (3)*

1. The Company manufactures metal and plastic parts for mobile homes and trailers. In July of 1967 the Union began to organize the Company's employees. From the very beginning of the drive the Company's president displayed clear antiunion animus, as Company's counsel conceded at oral argument. At the urging of the president certain of the older and more trusted employees began to question their fellow employees about union activity. One employee, possibly on her own initiative, "polled" the employees concerning sentiment toward the Union without any safeguards or assurances that they would not suffer reprisals for their answers. The president of the company made, and certain employees passed on to others, threats to close the plant. The trial examiner and the Board found that the employees who engaged in these activities were supervisory personnel within the meaning of the statute, and thus that the Company itself had violated section 8(a) (1) of the Act by coercive actions taken against its employees.

The only ground on which the Company seeks to avoid accountability for 8(a) (1) violations is that certain employees "were not supervisors and that their conduct cannot, therefore, be attributed to the Company." The evidence amply supports the Board's conclusion that employees Burgher, Gearing, and Hershey met the statutory standards of having the authority "in the interest of the Company" to "assign," "transfer," and "responsibly * * * direct" employees."[2] It is the Board's function to determine those who as a practical mat-

1. These are the material provisions of § 8 (a) of the Act, see 29 U.S.C. § 158(a):
   § 158. Unfair labor practices.
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [section 7 of the Act];
   * * * * *
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *
   * * * * *
   (5) to refuse to bargain collectively with the representatives of his employees * * *.
   * * * * *

2. Mary Burgher directed the work of other employees who worked with her, gave them job assignments, transferred them from job to job when necessary, gave them time off, and occasionally reprimanded them for poor work. Other employees testified that the Company president indicated when they were hired that Burgher would be their boss.
   Gearing was told by the Company's president that he would be in charge of employees at the main plant and would have several other responsibilities of a clearly supervisory nature. Though the other employees were paid little more than the minimum wage, Gearing had a salary of $10,000 a year.
   Hershey, the third employee in question, directed the employees in the plastics department, assigning their work and transferring them as necessary, and hired at least one employee.

ter fall within the statutory definition [3] of "supervisor." N.L.R.B. v. Swift & Co., 292 F.2d 561, 563, 1st Cir. (1961). Its finding is not undercut by the testimony relied on by the Company that they are not called supervisors, certainly not the testimony of the Company's president, and for that matter not the testimony of the employees involved since this merely falls into the groove of the titles used by the president. What is decisive is what the employees do rather than what they are called, and the evidence of what they do (see note 2) fully supports the Board's judgment that as a practical matter they are supervisors.

■ 2. The election sought by the Union was held on September 14, 1967, and the Union won 19 to 6. On September 15, the Company began a series of temporary and permanent layoffs. As to certain employees production quotas were increased. The Board found that the layoffs, discharges and changes in production quotas were discriminatorily motivated. We conclude that these findings are supported by substantial evidence.[4]

The layoffs began immediately after the election, which had results the Company considered adverse. The Company defends its actions on the ground that there was no work for the employees involved. No substantiated business reasons were offered for the alleged lack of work or sudden change in amount of work available. There was substantial evidence that in particular cases the no-work claim was pure fabrication.

The Board's findings and orders with respect to post-election layoffs, discharges, and changes in production quotas are affirmed.

B. *The Remedy Appropriate for the Patent Violation of Section 8(a) (5); Failure of the Board to Provide Satisfactory Justification for Limiting Relief to Order To Cease from Further Violations*

■ 1. The September 14 election resulted from an election petition that the Union had filed with the Board the previous August 1. On September 1, the parties entered into the usual agreement

3. Section 2(11) of the Act, 29 U.S.C. § 152 (11), defines a supervisor as:
   any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

4. The pattern of conduct shown by evidence credited by the Board is set out in the Board's opinion already cited. We see no need for detail on this point. It suffices to note:
   The day after the election instead of keeping the doors open so that workers could enter, as before, whenever they arrived in the morning, the Company began the practice of keeping the doors locked until 7:45 a. m. and made the early arrivals wait outside.
   The same morning the Union's election observer was deprived of work of winding hoses for shipment because a supervisor said they were defective. Yet there were 10-foot sections left from 25-foot hoses after 15-foot sections had been cut—and shipped. She was laid off again—ostensibly for lack of work. When she came to pick up her check the Company's president asked her for $50 he had provided when she was convalescing from an auto accident. She said she thought this was a gift. His reply: "It was at one time, but it isn't now." He added that she was "a very unappreciative employee."
   As to several employees there was no reason for layoff except "lack of work," and no substantiation of this at hearing. When one worker came to pick up his check the president asked how he voted, and he admitted he voted for the Union. Said the president: "I know you did. I just wanted to see what you would say about it."

   As to two employees whose previous norm had been 75 parts per day, the quota was raised to 125. One of them complained that a quota beyond 110 was not possible. She was told to produce 125 "or else." She had previously been told by the president: "You're making your bed, and I'll see that you pay for it." She worked to the end of the day and never returned to the plant.

providing that disputes would be settled by the regional director of the Board, and that his decisions would be final. Shortly after the Union's 19-to-6 victory, the Company contested the results of the election, on the basis of Union distribution of a certain leaflet on election morning and also on the basis of a claim that three of those who voted were not entitled to vote. The leaflet was mildly worded.[5] The regional director determined that it did not affect the validity of the election. He further determined that whatever the merits of the claim that three voting employees should not have voted, the Union's 19–to–6 majority mooted the issue.[6] Accordingly, he certified the Union as the exclusive bargaining representative of the Company's employees.

On November 10, the Union's attorney wrote to the Company's president asking that the Company meet with the Union to begin collective bargaining. He requested various kinds of information about the employees (names, wages, etc.), including any information that the Union "would need to bargain intelligently." Another letter was sent the same day to Harvey Rector, the Company's labor consultant, asking the Company to meet with the Union on November 15, or the earliest convenient date, to begin negotiations. No replies were received to either letter. On November 20, the Union's president wrote to Rector renewing his previous request for negotiations and information. Two days later Rector replied that the Company considered the Union's certification invalid because the Regional Director had "acted arbitrarily and capriciously" and denied the Company due process. Rector stated that he would

not meet with the Union until all litigation was disposed of. Two later letters from the Union to the Company requesting bargaining and information were ignored.

■ 2. The Company's refusal to bargain was a clear and flagrant violation of the law. Its objections to the election were patently frivolous, and violated the express terms of the Agreement for Consent Election, entered into with the Union only thirteen days before the election, to abide by the decision of the regional director. The Company gave not a hint of support or explanation for its claim that the regional director acted "arbitrarily and capriciously."

The Union contends that the Board's use of its traditional "remedy"—a cease-and-desist order—for a case of such intransigence bountifully and improperly rewards the Company for its transgression, and cannot be maintained as a faithful performance of the Board's task "of devising remedies to effectuate the policies of the Act." N.L.R.B. v. Seven-Up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953).

■ We conclude that the Union makes a substantial contention, and that the Board has not, on the record before us, provided a satisfactory justification for its order.

Section 10(c) of the Act, 29 U.S.C. § 160(c), requires the Board "to take such affirmative action * * * as will effectuate the policies of this subchapter."

The broad scope of the Board's function has been noted by the Supreme Court. An illuminating precedent is Fibreboard Paper Prods. Corp. v. N.L.R.B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.

---

5. The leaflet, entitled "Hold Everything !", said :

> Today is the day to vote for greater benefits. That is just exactly what a YES vote will mean. . . . Only you lose if you don't vote YES. You lose the right to have a say in your working conditions, you lose the right to have a say in how much money you make, you lose the right to have seniority, a pension plan, an insurance

plan, improved vacations, more holidays, and above all, the right to gain individual dignity. Your future is at stake today. The only way to make sure you don't lose a profitable and sure future is by voting YES today. * * *

6. This ruling is manifestly sound. *See* Manning, Maxwell & Moore, Inc. v. N.L. R.B., 324 F.2d 857 (5th Cir. 1963). It was not seriously contested on appeal.

2d 233 (1964), where the Supreme Court approved a Board order which awarded back pay on the basis of a contract no longer in effect. The Board determined, and the Court agreed, that the employer's unilateral action in subcontracting the work, which destroyed the jobs of his employees, violated his duty to bargain with the union. Though the contract was no longer in effect, the Board reinstated its terms. The Court upheld the Board's conclusion that this action "to insure meaningful bargaining" is well designed to promote the policies of the Act. As to the burden on the employer, the Court said, simply: "Nor is there evidence which would justify disturbing the Board's conclusion that the order would not impose an undue or unfair burden on the Company." (379 U.S. at 216, 85 S.Ct. at 406)

■ The "affirmative action" clause of § 10(c) is not a mere charter of authority that the Board has the option to exercise or ignore. It is, as the Court has recently stated, a "broad command." N.L.R.B. v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969).

■ We cannot discern, and the Board has not explained, on what basis it could or did conclude that its order under review is designed "to insure meaningful bargaining." Counsel for the Board tells us that the prospective order to bargain entered in this case is what is conventionally entered by the Board. Assuming the general validity of a purely prospective type of order, the case of brazen refusal to bargain, in violation of solemn obligations, presents special considerations. While such remedy may provide some bargaining from the date of the order's enforcement, it operates in a real sense so as to be counter-productive, and actually to reward an employer's refusal to bargain during the critical period following a union's organization of his plant. The obligation of collective bargaining is the core of the Act, and the primary means fashioned by Congress for securing industrial peace,

N.L.R.B. v. American Natl. Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). *"Enforcement* of the obligation to bargain collectively is crucial to the statutory scheme," id. at 402, 72 S.Ct. at 828 (emphasis added). Yet a prospective-only doctrine means that an employer reaps from his violation of the law an avoidance of bargaining which he considers an economic benefit. Effective redress for a statutory wrong should both compensate the party wronged and withhold from the wrongdoer the "fruits of its violation." Montgomery Ward & Co. v. N.L.R.B., 339 F.2d 889, 894 (6th Cir. 1965). "Effectuation of the Act's policies * * * requires that the employees whose statutory rights were invaded by reason of the Respondent's unlawful * * * action, and who may have suffered losses in consequence thereof, be reimbursed for such losses until such time as the Respondent remedies its violation by doing what it should have done in the first place." Winn-Dixie Stores, Inc., 147 N.L.R.B. 788, 792, aff'd in pertinent part, 361 F.2d 512 (5th Cir. 1966).

Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining. When the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees. *See* Ross, Analysis of Administrative Process Under Taft-Hartley, 1966 Labor Relations Yearbook 299, 302–03; Note, An Assessment of the Proposed "Make-Whole" Remedy in Refusal-To-Bargain Cases, 67 Mich.L.Rev. 374, 378 (1968). Thus the employer may reap a second benefit from his original refusal to comply with the law: he may continue to enjoy lower labor expenses after the order to bargain either because the union is gone or because it is too weak to bargain effectively.

Not only furtherance of national labor policy but also important considerations of judicial administration are involved. Simply put, the present posture of the Board encourages frivolous litigation not only before the Board, but in the review-

ing courts. The case at hand is in point. The position of the Company is palpably without merit with respect to its refusal to bargain. Yet it profited through the delay that review entails: all during this litigation it has not had to bargain collectively over wages or other financial aspects of employment.

The courts, then, are doubly concerned when Board inadequacies drain and divert judicial resources from the provision of justice to the crowded calendars and to meritorious litigants whose claims clamor for attention. The same considerations are presumably applicable at the administrative level.

■ There is a presumption that favors the Board, with its expertise, in its selection of remedies. Fibreboard Paper Prods. Corp. v. N.L.R.B., *supra*. *See also* Consolo v. FMC, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). That presumption is given full effect when the Board makes a conscious selection of remedies to effectuate the Act, provided reasons for its conclusion are stated or may fairly be discerned. That is not the situation in the case before us. The Board's silence on a substantial question raised by the Union is not sanctified by the circumstances that it was being passive rather than affirmative.

That indeed seems to be the misguided assumption of the Board—that it is not subject to disapprobation if it is only doing the same as it has done before. The Examiner declined to award further

relief to the Union on the ground that no such step had yet been authorized by the Board. Whatever merit in administrative terms may attach to this course at the Examiner level can hardly be adduced as justification for the Board's announcement in its decision that it was continuing the order drafted by the Examiner for the reasons stated by him. This kind of circularity hardly sustains an agency's disposition of a serious question.

We are aware that some aspects of the matter were argued to the Board some time ago in cases still not decided.[7] If it be assumed *pro tem* that there are considerations precluding development of a truly meaningful remedy in cases where the employer's failure to bargain rested on a debatable question, this would not preclude a meaningful remedy for a manifestly unjustifiable refusal to bargain like that involved in the case at bar.[8]

■ The Board's assumption seems to be that application of a uniform remedy stills all legal doubts. But it is as old in philosophy at least as Aristotle, and it is settled in the law as well,[9] that the application of an apparently uniform rule may in reality engender unfair discrimination when like measures are applied to unlike cases.

Nor must it be assumed that the grievances in the wake of abuses like those before us are solely those of the Union. There are grievances, too, that are felt by employers who have fulfilled their

---

7. Ex-Cell-O Corp., Case #25–CA–2377 (trial examiner's decision rendered March 7, 1967); Herman Wilson Lumber Co., Case #26–CA–2536 (TXD rendered Jan. 4, 1967); Zinke's Foods, Inc., Case #30–CA–372 (TXD rendered Dec. 18, 1966).

8. St. Antoine, A Touchstone for Labor Board Remedies, 14 Wayne L.Rev., 1039, 1043 (1968).
   The author also notes (see page 1042) that a make-whole order, being not only compensatory but also one that "can be shown to have a rational relation to the particular violation found" is not subject to interdiction as a purely "penal" remedy. The vitality of the "penal" objection is also undercut by the Supreme

Court's recent decision in N.L.R.B. v. J. H. Rutter-Rex Mfg. Co., Inc., 396 U.S. at 265, 90 S.Ct. at 421 (1969): "But the Board could properly conclude that backpay is not only punishment for an unfair labor practice, but is also a remedy designed to restore, so far as possible, the status quo which would have obtained but for the wrongful act."

9. Green v. County School Bd. of New Kent Cty., 391 U.S. 430, 88 S.Ct. 1689, 20 L. Ed.2d 716 (1968); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Yu Cong Eng v. Trinidad, 271 U.S. 500, 46 S.Ct. 619, 70 L.Ed. 1059 (1926).

legal obligation to bargain, especially if they are competitors.

We would not cavil with the Board's course if it appeared that no further action could lawfully be taken by the Board. But we see no basis for such a claim. There may be difficulties in one of the proposals offered by the Union in this case: that the Company be ordered to pay dues, for the pay period "lost" to the employees by virtue of the Company's violation, to the union they selected as their agent. We are in no position to gainsay the possibility that an agency might reject the proposal for reasons of sound administrative policy. And any such proposals would have to be shaped to take into account legal considerations.[10]

But even if the Board declines to take the steps advocated by the Union, it may conclude that some other remedies will at least do something to advance the policies of the Act, and prevent the employer from having a free ride during the period of litigation.[11]

█ In reaching its conclusion on appropriate remedies and the extent to which it can base them on probable employer-employee relationships, the Board may properly take into account the doctrine of N.L.R.B. v. Mooney Aircraft, Inc., 375 F.2d 402 (5th Cir.), cert. denied, 389 U.S. 859, 88 S.Ct. 104, 19 L.Ed.2d 125 (1967), wherein enforcement was granted to the Board's back pay order at higher wages than the employee had been making prior to his discharge, because the Board had concluded that the employee probably would have been promoted.

█ A tribunal given the function of implementing national policy through compensatory remedies may not soundly refer to the difficulty in quantifying appropriate compensation as a justification for withdrawal and frustration of the policy, particularly where such an approach would operate only to reward the wrongdoer and to give him an advantage over a law-abiding competitor. Pertinent doctrine was stated thus in Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–580, 90 L.Ed. 652 (1946):

In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. * * * Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. * * * That principle is an ancient one, Amory v. Delamirie, I Strange 505, and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application.

The Supreme Court has recently pointed out the propriety, within the national labor policy, of putting on the wrong-doing employer the burden of compensating employees for the loss suffered during a period of unusual Board delay,

---

10. Since the dues and initiation fees would have come from the employees' pockets and not from the Company, any assessment of these charges against the Company would have to be substracted from back pay awards. This would avoid the legal problem of a Board order awarding more than back pay.

11. Thus, other unions have recommended, for example, assessment of costs of litigation.

a delay that the employer might with reason have failed to contemplate.[12]

This principle has added force in a case, like the one before us, where the delay in requiring the Company to conform to the law was not unusual in extent, was of benefit to the Company from its viewpoint, and was in fact sought by the Company.

■ The power to accord some meaningful make-whole relief is not necessarily undercut by the provision in section 8(d) of the Act that the obligation to bargain collectively "does not compel either party to agree to a proposal or require the making of a concession." In this case the refusal to bargain is clear and unmistakable, and there is not the slightest suggestion that a refusal to make a concession might be identified as a refusal to bargain collectively. The Board cannot be faulted on the ground that it is imposing contract terms upon an unwilling employer when it is engaged only in a determination of a means of calculating a remedy to compensate for injury sustained from an unfair (and unlawful) labor practice. This is not mere playing with words. We are in accord with the view of a careful student of this field of law who points out that no one would suggest that the award of damages in an antitrust suit would constitute the imposition of contract terms even if the calculation of reasonable and probable

damages took into account a conclusion as to business opportunities denied, based on an appraisal of an agreement the parties probably would have realized but for the defendant's illegal acts. *See* St. Antoine, A Touchstone for Labor Remedies, 14 Wayne L.Rev. 1039, 1053 (1968). Let us consider a more homely analogy: Suppose an employer assaults and incapacitates someone who is working as a stock clerk while finishing engineering school. Certainly a court would not be debarred from considering evidence indicating that in due course the clerk would likely have been employed as an engineer merely because the employer was under no contract requirement to employ him on that basis. Similarly the make-whole remedy—which could be measured not by any sentiment as to what the parties *should* have agreed to, but only by a determination, on the basis of all the evidence available, of what it is likely the parties *would* have agreed to—provides money compensation as a remedy for past wrongs. Combined with the traditional remedy, it imposes no present or future contract obligations, and operates as to the future not by assuring the employees any right to certain terms, but only by requiring for the future what could not be provided for the past, *i. e.*, collective bargaining as required by the law. This approach is not forbidden by section 8(d) of the Act.[13]

No serious objection may be lodged against the make-whole relief because it

12. *See* N.L.R.B. v. J. Rutter-Rex Mfg. Co., *supra:*

Either the company or the employees had to bear the cost of the Board's delay. The Board placed that cost upon the company, which had wrongfully failed to reinstate the employees.

13. This conclusion is further supported by cases like *Fibreboard, supra,* and *Mooney Aircraft, supra.* In those cases the courts upheld a remedy which was permissible under section 10 even though the Board justified the reasonableness of the technique by noting that it was a continuation of an existing agreement that probably would have been entered into. The permissibility of the order under section 10 of the Act is not obviated by the employer's failure to include the pertinent provision in the terms of a pending agree-

ment. Cf. N.L.R.B. v. Strong, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969), holding that the prohibition against the Board's undertaking to enforce the provisions of a labor contract does not bar it from ordering back pay and fringe benefits agreed to by an employer in a contract he subsequently declined to sign, since the order was valid under section 10 as a remedy for an unfair labor practice.

As to various objections that a make-whole remedy is impractical, they rest either on the difficulty of assessing damages, a matter that is not controlling as our discussion above (pp. 1251, 1252) indicates, or else relate to policy considerations that are for assessment by the Board in the first instance.

adds elements of novelty to the Board's lexicon of orders. In the pithy words of Judge, now Chief Justice Burger: "In the evolution of the law of remedies some things are bound to happen for the 'first time.' " [14]

We have given careful consideration to the recent decision in H. K. Porter Co., Inc. v. N.L.R.B., 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). In *Porter* the Supreme Court ruled that the Act puts a limitation on the permissible scope of a Board's order, even where the employer has in bad faith refused to bargain. The Court did not recede from, indeed it expressly reiterated, the principle that the "Board's remedial powers under § 10 of the Act are broad." But it held that they were not so broad as to override the specific provision and policy of the Act which forbids the Board from "compel[ling] agreement when the parties themselves are unable to agree." 397 U.S. at 108, 90 S.Ct. at 826. We have had this principle firmly in mind throughout our consideration, and have not proceeded on the assumption that the case at bar might justify a qualification of that principle. We in no way suggest either that the Board can compel agreement or that the make-whole remedy is appropriate under circumstances in which the parties would have been unable to reach agreement by themselves. Quite the contrary, we have specifically limited the scope of our remand first, to consideration of past damages, not to compulsion of a future contract term, and second, to relate to damages based upon a determination of what the parties themselves would have agreed to if they had engaged in the kind of bargaining process required by the Act. It is not within the scope of our remand for the Board to measure the amount of damages by reference to any contract term which could have been brought about only through a mandate to the employer not merely to engage in the process of collective bargaining but also to agree on a contract provision.

We reiterate that damages can be awarded on an assessment of the contract terms that would have been in effect if the law had been complied with even though the law-violating employer has not yet entered into the contract. Fibreboard Paper Prods. Corp. v. N.L.R.B., *supra*; N.L.R.B. v. Mooney Aircraft, Inc., *supra*.

The Union has asked for remand to the Board for further consideration of the make-whole claim (while the remainder of the Board's order is enforced). We think this is sound. In view of the interest of judicial administration, including the impact on court dockets, we accompany our remand with a directive to make supplementary findings in the event the Board determines on remand that it should not grant any make-whole relief, in whole or in part. If the Board believes that alternative remedies,[15] beyond those already granted, are more appropriate, it should so state. The assessment of these matters is for the Board.

The Board's application for enforcement of the order as issued is granted. On the Union's petition for review, the case is remanded for further proceedings not inconsistent with this opinion.

So ordered.

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

The majority opinion remands the case involving the Union's petition for review

---

14. International Broth. of Operative Potters v. N.L.R.B., 116 U.S.App.D.C. 35, 39, 320 F.2d 757, 761 (1963). The opinion approves the award of interest as well as back pay, and overrides the objection that this has punitive aspects since the obligation is public, pointing out that the award of interest effectuates the Act as "plainly in the direction of making the employee whole." *Id.*

15. The scope of the Board's consideration on remand, if it is deemed that the Union's proposal goes too far, would include consideration of such lesser, alternative remedies as an award to the Union for excess organization costs caused by the Company's behavior, or for the costs of having to litigate a frivolous case, or for a combination of these.

for further proceedings by the Board to consider the Union's request of their so-called "make-whole claim." With respect to this Union request, the majority opinion says, "We think this is sound," but admits "There may be difficulties in one [only one?] of the proposals offered by the Union in this case: that the Company be ordered to pay [Union] dues, for the pay period 'lost' to the employees by virtue of the Company's violation * * *." (1251). In evaluating what is involved in the remand ordered by the majority the entire Union request for so-called "remedial relief" must be considered.

The Trial Examiner refused to recommend the remedial relief requested by the Union and the Board affirmed his findings and recommendation by denying the Union's request in its entirety. The Union request for additional relief as set forth in its brief to this court follows:

In support of its request for compensatory relief to maintain the *status quo ante* pending compliance by the Company of its duty to bargain collectively, the Union adduced competent and uncontested testimony (TDX 18; Tr. 494–497, 509–510) that a contract would have been consummated within seventy-five (75) to one hundred (100) days of the Union's November 8 certification (Tr. 498–500). A complete contract proposal (GC Exhibits 13 and 14) was submitted and received by the Company which requested an immediate wage increase of fifteen (15) cents per hour followed by a further wage increase of twenty (20) cents per hour as of February 1, 1968, when the minimum lawful rate of one dollar and sixty cents ($1.60) per hour became compulsory under the Fair Labor Standards Act. These wage increases would merely establish a rate of fifteen (15) cents per hour above the minimum statutory rate, a level of compensation considerably below the prevailing area wages paid to comparable employees for similar work (C.P. Exhibits 1, 2, 3 and 4; Tr. 505–507).

In the foregoing premises the Union requested that minimal compensatory relief be computed and awarded by the Board, as follows:

1. that the Company pay at least fifteen (15) cents an hour to its employees as of such date a contract would have been executed.

2. that in addition to the rate established pursuant to '1' above, the Company pay its employees cost-of-living increases of one (1) cent per hour for each 0.4 increase in the Consumer's Price Index published by the United States Department of Labor (1957–1959 equal a base period of 100).

The Union also established that the prevailing contract practice in the area by employers comparable with the Company was to include a union security clause in such contracts that are negotiated (Tr. 498). In this premise, coupled with the nineteen (19) 'yes' votes that were recorded for the Union in the representation election, the Union requested the Board to direct the Company to pay the Union an amount equal to such dues and initiation fees that would have been realized beginning March 18, 1969, the date that a union security provision would have been in force and effect as part of a contract negotiated following the Union's certification. In computing such amount, the Union requested that said amount be established on a minimum basis of nineteen (19) employees and with such additional employees as are evidenced by written bargaining authorizations secured since the certification of the Union.

The Union's petition thus requests that an order issue requiring the Company to make payments to the Union and its employees based on the premise that a contract would have been consummated within 75 to 100 days of the Union's November 8th certification providing for pay raises to all employees of 15¢ per hour plus a certain cost of living increase and including an amount as dues

and initiation fees for 19 employees [1] that voted for the Union on the assumption that the contract would have been executed with a "union security clause" (checkoff), such dues and fees to begin on March 18, 1969.

At the outset I note that the adequacy of the Board's remedies in unfair labor practice cases is currently being debated. As the Trial Examiner in this case stated:

> The Union's request for this type of an expanded remedy represents the views of a growing body of respectable authority who take the position that the Board's current policy and practice in remedying this type of unlawful refusal to bargain is neither adequate nor realistic. There is currently pending before the Board at the present time two cases in which such a request is being considered (*Zinke's Foods*, Case 30–CA–372 and *Ex-Cello-O-Corp.*, Case 25–CA–2377). In each of these cases the Board has received oral argument on the question of an adequate remedy, but has not, as yet, rendered its decision.

*See also* St. Antoine, A Touchstone for Labor Remedies, 14 Wayne L.Rev. 1039 (1968).

However, at least some of the questions that have been raised have recently been answered by the Supreme Court in H. K. Porter Co. v. N.L.R.B., 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). In that case, the Supreme Court reversed and remanded to this court an order of the N.L.R.B. issued after an opinion by a panel of this court required an employer to

> "[g]rant to the Union a contract clause providing for the checkoff of Union dues." 172 N.L.R.B. No. 72, aff'd, H. K. Porter Co. v. N.L.R.B., 134 U.S. App.D.C. 227, 414 F.2d 1123 (1969).

The Court held that the Board was without power to "compel a company or a union to agree to any substantive contractual provision of a collective bargaining agreement." H. K. Porter Co. v. N.L.R.B., *supra*, 397 U.S. at 102. In reaching this decision, Justice Black reviewed the relevant legislative and judicial history of labor relations in this country. His historical analysis makes it " 'clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.' N.L.R.B. v. American Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952)." H. K. Porter Co. v. N.L.R.B. *supra*, 397 U.S. at 106. *See also* Cap Santa Vue, Inc. v. N.L.R.B. 137 U.S.App.D.C. ——, 424 F.2d 883 (1970) where a similar conclusion based on this legislative and judicial history was reached.

In my opinion the history of the Act thus makes it clear that the policy behind the Act is to rely on collective bargaining and to avoid compulsory arbitration. Heretofore it had been generally considered that this was the position of labor and management. At labor's request, were we now to empower the Board to write labor contracts on wages and union security, the time may well come when labor would be dissatisfied with a governmental board exercising such power. The character of the Board is subject to constant change and considerable wisdom may have been exercised in restricting its power in the contractual area.

With these principles in mind, I turn to the instant case. The majority holds that "damages can be awarded on an assessment of the contract terms that would have been in effect if the law had been complied with even though the law-violating employer has not yet entered into the contract. * * *" Fibreboard Paper Prods. Corp. v. N.L.R.B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), and N.L.R.B. v. Mooney Aircraft, Inc., 375 F.2d 402 (5th Cir.), cert. denied, 389 U.S. 859, 88 S.Ct. 104, 19 L.Ed.2d 125 (1967), are cited in support of this proposition. In the *Fibreboard* case, the

---

I. Plus any additional employees that might sign written bargaining authorizations.

unfair labor practice was the failure of the employer to negotiate with his employees the subcontracting out of certain work which had previously been performed by them. The effect of this unfair labor practice was to permit the employer to subcontract out the work in question without giving his employees a chance to negotiate the point. The Board ordered the original contract reinstated and the Court affirmed. It could be argued that no other remedy would have been adequate in the circumstances of the case. To reinstate the contract was simply to put the parties back in the last legal position they occupied. The Court did not hold that the contract must continue after the parties negotiated and thus it did not attempt to dictate a substantive term of the contract. This case does not provide authority for the step the majority takes in the instant case.

In the *Mooney Aircraft* case, the Fifth Circuit upheld a backpay order which included an amount the wrongfully-discharged employee would "in all probability" have received as a pay raise had he not been discharged. The decision must be read in light of the fact that the failure of the employer to grant the pay raise was in itself wrongful and discriminatory. The court was of the opinion that "[t]he relief granted was therefore necessary to extinguish the effects of the discrimination." N.L.R.B. v. Mooney Aircraft, Inc., *supra*, 375 F.2d at 403. Thus the remedy both in the *Fibreboard* and *Mooney Aircraft* cases was based on pre-existing contract rights. They are scarcely authority for the proposition that the Board may in effect write a contract where one did not exist before, and then base its remedy on the contract it has written.

The majority cautions that the "make-whole" remedy "could be measured not by any sentiment as to what the parties *should* have agreed to, but only by a determination, on the basis of all the evidence available, of what it is likely the parties *would* have agreed to * * *." The Board, according to the majority opinion, is thus required to determine what the parties would have agreed to if they had bargained. However, if any prediction were to be made, the history of this case seems to make it clear that the most realistic prediction would be that the parties would not have agreed to anything. Any other conclusion is difficult to reach in light of the Company president's "antiunion animus" and the "patently frivolous" objections to the election. In my opinion, the Board is thus necessarily relegated to a determination of what the parties *should* have agreed to had they bargained. In time, such power may well prove dangerous both to unions and to employers.

But this is not the greatest problem I have with the majority opinion. Even if the Board could somehow predict what the parties would have agreed to, the wrong is still that any such process would require the Board to determine a "substantive contractual provision." That the Board acts in the past rather than the present does not, in my opinion, eliminate the prohibition in this respect of H. K. Porter Co. v. N.L.R.B., *supra*. In that case, Justice Black concluded:

> It may well be true, as the Court of Appeals felt, that the present remedial powers of the Board are insufficiently broad to cope with important labor problems. But it is the job of Congress, not the Board or the courts, to decide when and if it is necessary to allow governmental review of proposals for collective bargaining agreements and compulsory submission to one side's demands. The present Act does not envision such a process. H. K. Porter Co. v. N.L.R.B. *supra*, 397 U.S. at 109, 90 S.Ct. at 826.

The power the majority opinion seeks to have the Board apply has been expressly withheld by Congress. 1 Legislative History of the Labor Management Relations Act, 1947, pp. 310, 538. In the language of the House Conference Report No. 510 on H.R. 3070, 80th Congress,

> "This mutual obligation (to engage in collective bargaining) was not to compel either party to agree to a proposal

or require the making of a concession." p. 538.

The fundamental error of the majority *opinion* is thus that it would authorize damages on the likelihood that certain results would be reached that the Act provides are not required to be reached. Here the cause of the alleged damage for which the Union requests reimbursement is actually the refusal of the Company to agree to a contract (not the failure to bargain collectively) but no damages can be assessed therefor because there is no legal duty upon either party to agree upon a contract. Thus, even assuming a failure to *bargain*, the damages here are not being assessed on that basis but upon a failure to *agree*, which is not a duty imposed on either party, and a failure to agree upon a specific result, which is entirely speculative.

I would accordingly affirm the Board's order in No. 22911 and deny the Union's petition in No. 22797.